FILED

2013 May-10  PM 05:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **JESSICA LEE WALLACE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:11-CV-2723-VEH** |
| | ) |
| **ERIC H. HOLDER, JR., in his** | ) |
| **Official Capacity as Attorney** | ) |
| **General of the United States** | ) |
| **Department of Justice, (Federal** | ) |
| **Bureau of Investigation), Agency,** | ) |
| | ) |
| **Defendant.** | ) |

---

## MEMORANDUM OPINION AND ORDER

## I.     INTRODUCTION

Plaintiff Jessica Lee Wallace ("Ms. Wallace") initiated this job discrimination case arising under Title VII of the Civil Rights Act of 1964 against Defendant Eric H. Holder, Jr., in his official capacity as the Attorney General of the United States Department of Justice (the "Attorney General"), on July 29, 2011.  (Doc. 1).  The lawsuit stems from Ms. Wallace's efforts to become employed with the Federal Bureau of Investigation (the "FBI").

Ms. Wallace filed an amended complaint (Doc. 28) on March 12, 2012.  Ms. Wallace's amended complaint contains five counts:  one for sex discrimination and

the remaining four for retaliation.  *See generally id.*

Pending before the court is the Attorney General's Motion for Summary Judgment (Doc. 42) (the "Motion") filed on October 12, 2012.  The parties have briefed the Motion (Docs. 43-46), and it is now under submission.  For the reasons explained below, the Motion is **GRANTED** as to counts one and five of Ms. amended complaint and is otherwise **DENIED**.

## II.    FACTUAL BACKGROUND[1]

During 2007-2009, Ms. Wallace was a female applicant in Birmingham, Alabama, for a special agent position ("SA") with the FBI.  AF No. 1.[2]  In order to be

---

[1]  Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact.  *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

[2]  The designation "AF" stands for admitted fact and indicates a fact offered by the Attorney General that Ms. Wallace has admitted in her written submissions on summary judgment or by virtue of any other evidence offered in support of her case. Whenever Ms. Wallace has adequately disputed a fact offered by the Attorney General, the court has accepted Ms. Wallace's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of the Attorney General's statement of facts as set forth in Doc. 43 and responded to by Ms. Wallace in Doc. 45.  A number following a decimal point corresponds to the particular

hired as an FBI SA, applicants must pass a physical fitness test ("PFT").  AF No. 2.

There is a specific protocol for each of the four events in the PFT–sit-ups, push-ups, a 300 meter sprint, and a 1.5 mile run.  AF No. 3.  Applicants receive a score for the PFT derived from a rating scale which assigns points based on the number of sit-ups and push-ups an applicant performs correctly, along with the times the applicant completes the 300 meter sprint and the 1.5 mile run.  AF No. 4.1.  Those points and the final score are shown on the applicant's PFT report which is completed by the employee who is administering the testing and signed by the applicant at the close of the PFT.  AF No. 4.2.  As indicated on the PFT report, an applicant must receive a minimum score of 12 points to pass the PFT.  AF No. 5.

Between July 2007 and March 2009, Ms. Wallace took four PFTs –July 17, 2007; July 17, 2008; November 14, 2008; and March 16, 2009, respectively.  AF No. 6. Ms. Wallace took her first PFT, administered by FBI Special Agent Harold Keeler, on July 17, 2007.  AF No. 7.  Ms. Wallace has admitted that the reason she failed the first PFT was because she was "not physically ready"and testified at her deposition that she does not maintain she was discriminated against during that PFT.  AF No. 7.

---

sentence within the numbered statement of facts.  For example, (AF No. 4.2) would indicate the second sentence of paragraph 4 of the Attorney General's statement of facts is the subject of the court's citation to the record.  Other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

Ms. Wallace took the second PFT, this time administered by Brad Snider ("SA Snider"), exactly one year later on July 17, 2008.  AF No. 9.  Ms. Wallace admitted that the reason she failed the second PFT was because of a "lingering hip injury" and testified during her deposition that she does not claim she was discriminated against during that second PFT.  AF No. 10.

Ms. Wallace took the third PFT, again administered by SA Snider, on November 14, 2008, and did not pass that PFT either.  AF No. 11.  During this third PFT, Ms. Wallace complained to SA Snider that he did not use the proper protocol during that PFT because he made her start her push-ups from the down, rather than up, position.  AF No. 12.

After Ms. Wallace complained to SA Snider that starting the push-ups in the down position was not in the FBI's protocol, he agreed to void the November 14, 2008, PFT and allowed her to re-take that PFT the following Friday.  AF No. 16.  Ms. Wallace does not allege in her complaint that she was discriminated against during the November 14, 2008, PFT.  AF No. 18.

Due to a recurrence of mononucleosis, Ms. Wallace was unable to take the re-test PFT the following Friday and was not released by her doctor to take the re-test until March 9, 2009.  AF No. 17.  Ms. Wallace took the fourth PFT (the re-test of the November 14, 2008, PFT) on March 16, 2009, and this PFT test forms the basis of

her claim of gender discrimination against the FBI.  AF No. 19.

SA Snider administered the March 16, 2009, PFT to two persons – Ms. Wallace and a male applicant.  AF No. 20.  A minimum overall score of 12 points is required to pass the PFT.  (Doc. 44-15 at 2-3 ¶ 4).  Both Ms. Wallace and the male applicant did not pass the March 16, 2009, PFT.  AF No. 22.

While Ms. Wallace's overall score of 11 was higher than the male applicant's total of 10 points and her assigned points in the area of push-ups was higher too (2 for her versus 1 for him), SA Snider credited her with fewer completed push-ups (19) than the male applicant (30).  (*Compare* Doc. 44-2 at 18, *with* Doc. 44-15 at 7).   Ms. Wallace maintains that she did not pass this fourth test due to improper scoring by SA Snider in the area of push-ups specifically.  (Doc. 45 at 4 ¶ 22).

Ms. Wallace further complains that during the March 16, 2009, PFT, SA Snider spoke condescendingly to her when, as the male applicant was about to begin his sit-ups, SA Snider asked her if she was "okay with holding the male applicant's feet and wanted to make sure that she was strong enough because he did not want [Ms. Wallace] to hurt the rest of [her] score."  AF No. 24.

During his deposition, SA Snider explained his reasoning for asking Ms. Wallace this question:

You know, as a matter of routine when we were giving these applicant

tests, you know, just during the course of the conversation we would ask the applicant, you know, who has been, you know, holding your feet, you know, during testing.  You know, it may be their wife, it may be, you know, their–you know, a buddy of theirs or whatever, and what it comes down to is the physical end, this portion, sit-up portion of the physical fitness test is a counterbalance issue, so if you have an individual that weighs two hundred and thirty pounds, there's no way that sit-ups is going to be able to be done in accordance with FBI protocol.

The protocol requires the individual that's holding the feet of the applicant that's conducting the test to place their knees–or they can do it this way, you can't do anything more than this.  Place their knees on the applicant conducting the test toes, the palms of their hands across the laces , and then the applicant is able to begin doing the sit-ups.

So, the question, you know, posed to Jessica, and this based off, you know, the routine that we practiced time and time again in testing these applicants was directed to the individual doing the sit-ups, you know, are you comfortable with her holding your feet, are you comfortable and, Jessica, are you comfortable holding this individual's feet.

And the reason the females are asked that question is, you're placed in a precarious position, I mean, you're holding, you know, the feet of a male applicant looking at the groin area of the male.  So that's the question posed to both of the individuals.

(Doc. 44-5 at 12 at 36-38 at lines 17-23, 1-23, 1-15).  In response to a follow-up

question, SA Snider testified:

Q.    It just strictly had to do with counterbalancing and looking at a groin area?

A.    That's correct.  Very rarely do we have females and males taking a test at the same time.  You know, the others–you know, I guess

> three occasions that we had females out there, we either would
> have another female agent or the females hold each other's feet.
> So, that's the issue.

(*Id.* at 39 at lines 7-17).

Ms. Wallace also maintains that during the March 16, 2009, PFT, SA Snider

did not use proper protocol in instructing her on her push-ups because he told her that

"she needed to look forward with [her] head" rather than looking down.  (AF No. 26).

SA Snider gave Ms. Wallace this advice because at the time of the March 2009 PFT,

he was aware from the previous PFT which he administered (and subsequently

voided) that Ms. Wallace's weakest area was push-ups.  AF No. 27.[3]

Although Ms. Wallace questions the validity of SA Snider's explanation for

instructing her in this manner,[4] he has stated that his reasoning for doing this was so

---

[3] The court notes that Ms. Wallace attempts unsuccessfully to dispute this fact. (Doc. 45 at 4 ¶ 27).  However, noticeably absent from this factual challenge is any citation to proof.  Moreover, Ms. Wallace's own deposition testimony and earlier sworn statement undisputedly establish that SA Snider was her testing administrator on November 14, 2008, and that she completed and complained about his administering of the push-up portion of that examination.  (Doc. 44-1 at 10 at 33 at lines 20-24; *id.* at 11 at 34 at lines 8-9 ("I went into the push-up part of the test and Brad Snider said that I needed to lay flat on the ground . . . .")); (*see also* Doc. 44-2 at 8 ("On November 14, 2008, I retested with Snider.")).

[4] Ms. Wallace suggests in her factual opposition that "[S.A.] Snider's explanation is in direct contradiction with proper FBI protocol for push-ups."  (Doc. 45 at 3 ¶ 14).  For evidentiary support, Ms. Wallace cites to page 7 of SA Ellingwood's "Report of Counseling" (the "Report").  In her Report, SA Ellingwood states that "[Ms.] Wallace <u>believes</u> that she was subjected to a different and more

that Ms. Wallace would more likely lower her body to the necessary level to be successfully credited with completing the push-up.  (AF No. 29); (Doc. 44-6 at 4-5). Ms. Wallace did not complain directly to SA Snider about any protocol issue during the March 16, 2009 PFT.  AF No. 32.

After completing the PFT on March 16, 2009, Ms. Wallace signed the report which indicated that she had completed 19 push-ups[5] and, also reflected, in a handwritten note, that her "conditional offer of employment has been verbally rescinded due to [her] failure of [the] 3rd PFT."  (Doc. 44-2 at 18).  While Ms. Wallace recalls signing the report, she testified that when she did so, she believed that

_____

difficult push-up protocol" and that "[Ms.] Wallace <u>believes</u> that . . . this same tester's more difficult standards resulted in the disqualification of six of her push-ups, causing her to fail the APFT by one point."  (Doc. 44-2 at 26 (emphasis added)). Nowhere within her Report does SA Ellingwood affirmatively conclude that SA Snider unfairly administered the push-up portion of the PFT to Ms. Wallace.

[5] Ms. Wallace has indicated that she questions the report's accuracy in reflecting only 19 push-ups because she has never seen the original (Doc. 45 at 4 ¶ 23), and "when [she] signed the sheet, [she] thought it had 25 written on it."  (Doc. 44-1 at 14 at 48 at lines 24-25).  The Attorney General responds that Ms. Wallace never asked to see the original of this document during the discovery process (Doc. 46 at 6) and further that Ms. Wallace's March 31, 2009, correspondence to AD Raucci confirms that SA Snider only gave her credit for completing 19 acceptable push-ups.  (*See* Doc. 44-4 at 3 ("At push up number twenty-five, Agent Snider told me that he was only counting nineteen.  I was frustrated.")).  Ms. Wallace's earlier deposition testimony further confirms that SA Snider told her that he was only giving her credit for 19 push-ups.  (*See* Doc. 44-1 at 14 at 46 at lines 15-18 ("And Snider stood over me the entire time yelling at me, telling me that he wasn't counting any of these push-ups.  And that all he was counting was 19.")).

the number of push-ups she completed was actually 25.  (Doc. 44-1 at 14 at 48 at line 25).

Although SA Snider is not a certified PFT administrator, he has indicated that he followed the same process for all applicants, male and female.  AF No. 34.  SA Snider also has explained that he was trained by the FBI Division's PFT Coordinator, SA Harold Keeler ("SA Keeler"), regarding the process and protocols of the PFT so that he could act as SA Keeler's back-up test administrator while he was in Iraq. (Doc. 44-6 at 3).

On March 18, 2009, Ms. Wallace met with Administrative Specialist Sherolynne Coachman ("AS Coachman") and another FBI employee, Raymond Zicarelli ("SA Zicarelli"), and complained to them about the protocol used by SA Snider while administering the March 16, 2009, PFT.  AF No. 40.  During that March 18, 2009 meeting, AS Coachman suggested to Ms. Wallace that she send an appeal letter to the Assistant Director of the FBI headquarters, John Raucci ("AD Raucci"), concerning the March 16, 2009, PFT.  AF No. 41.

In response to AS Coachman's suggestion, Ms. Wallace sent a letter dated March 31, 2009, to AD Raucci complaining about the protocol SA Snider used during the November 2008 and March 2009 PFTs; alleging that SA Snider had retaliated against her because she had complained to him about his protocol; and alleging that

SA Snider had treated her differently than male applicants.  AF No. 42.1.  In that letter she requested that she be certified as passing the PFT or, alternatively, be given a chance to retake the PFT in the Mobile, Alabama field office.  AF No. 42.2.

Ms. Wallace also initiated contact with EEO counselor and SA Rebecca Ellingwood ("SA Ellingwood") on March 27, 2009.  AF No. 43; (Doc. 44-1 at 32). On April 17, 2009, Ms. Wallace filed a formal EEO complaint alleging gender discrimination and retaliation by SA Snider.  AF No. 44.1.  In the section of that administrative complaint which asked Ms. Wallace to explain how she had been discriminated against, Ms. Wallace referred the FBI to her March 31, 2009, correspondence to FBI AD Raucci.  AF No. 44.2; (Doc. 44-1 at 35).

In a letter dated May 26, 2009, Ms. Wallace was advised that her retaliation claim against SA Snider was being rejected since that claim did not appear to be based on protected EEO activity.  AF No. 45.  Ms. Wallace agreed with the decision to reject the retaliation claim against SA Snider.  In her pending complaint, Ms. Wallace does not allege any retaliatory conduct on the part of SA Snider.

Ms. Wallace was verbally advised by SA Ellingwood on May 4, 2009, and then again by letter from FBI Headquarters dated May 28, 2009, that she would be allowed to retake the PFT at the Mobile, Alabama, field office before a certified PFT administrator as Ms. Wallace had requested in her appeal letter to FBI AD Raucci and

in her administrative EEO complaint.  AF No. 48.  On June 10, 2009, Ms. Wallace was contacted by SA Ruth Krona ("SA Krona") of the FBI's Mobile field office to schedule a date for Ms. Wallace to re-take the PFT.  AF No. 49.

In response to that June 10, 2009, contact, Ms. Wallace advised SA Krona that she had been on medication that restricted her from running and, as a result, her re-test would need to be delayed.  AF No. 50.  On June 23, 2009, Ms. Wallace sent AS Coachman an email advising that she had been diagnosed with mononucleosis. AF No. 51.

On July 1, 2009, Ms. Wallace sent AS Coachman a second email advising that she was still awaiting a medical release from her physician and indicated she might need time to get her strength back before taking the offered PFT.  AF No. 52.  On July 9, 2009, Ms. Wallace sent AS Coachman a third email advising that she remained under her doctor's care and that she was seeking a new physician.  AF No. 53.1.  In that email, Ms. Wallace also asked AS Coachman if she needed a medical release signed by her current physician.  AF No. 53.2.

On July 10, 2009, AS Coachman replied via email to Ms. Wallace and advised her that she would be required to provide a medical release from her doctor certifying that she is in good health to take the PFT.  AF No. 54.1.  Ms. Wallace then responded stating "Great.  Basically I can have any physician I see complete the form.  Thanks!

…" AF No. 54.2.

On September 30, 2009, Ms. Wallace sent AS Coachman an email advising that she had been diagnosed with Sjogren's syndrome and fibromyalgia and advising that she "would like to redo the PFT with the female agent from Mobile in about 6-8 weeks." AF No. 55.1. Ms. Wallace also asked AS Coachman "[w]hat do you need from me as far as medical information goes." AF No. 55.2.

On November 13, 2009, Ms. Wallace sent AS Coachman an email stating "I'd like to retake the [PFT] in the next couple of months. I have a doctor's appointment in early December and I could probably get released medically at that point. What do I need to do in order to test again? Do I need to get all of my doctor's records or do I just need to get some kind of note from the doctor that has been treating me (the Rheumatologist)? Please let me know." AF No. 56.

On November 23, 2009, AS Coachman emailed Ms. Wallace stating "Jessica I forward [sic] to you earlier today the form the doctor need [sic] to sign. He just need [sic] to certify that you are in good condition to take the PFT. You will be scheduled for a pre-employment physical examination once you pass the PFT and polygraph…." AF No. 57. On November 23, 2009, Ms. Wallace responded to the above email stating "Great. Thanks. I will be in contact with you after my appointment." AF No. 58.

At some point during this time period, Ms. Wallace contacted SA Ellingwood and communicated that she wanted to file an EEO complaint on AS Coachman for failing to contact her regarding PFT retakes.  (Doc. 44-1 at 18 at 65 at lines 16-24). Even though Ms. Wallace has not alleged retaliation by AS Coachman in her amended complaint, AS Coachman has submitted her declaration explaining that the delay in responding to Ms. Wallace's emails was because AS Coachman was waiting on a reply from FBI headquarters to her inquiry as to how long the offer to allow Ms. Wallace to be retested would stay open.  AF No. 61.

Ms. Wallace testified that SA Ellingwood did not ever respond to her request for a separate EEO complaint to be filed against AS Coachman and SA Zicarelli. (Doc. 44-1 at 22 at 78 at lines 20-23; *id.* at 23 at 82 at lines 20-23; *id.* at 83 at lines 5-9 ).  SA Ellingwood also "told [Ms. Wallace] that by filing an EEO initially [she] would more than likely be labeled a troublemaker." (*Id.* at 22 at 79-80 at lines 25-25, 1).  Additionally, SA Ellingwood tried to persuade Ms. Wallace "several times . . . to drop [her] case." (Doc. 44-1 at 22 at 80 at lines 2-3).  Dissatisfied with the handling of her situation, Ms. Wallace indicated at her deposition that sometime between November 23, 2009, and December 2009, she decided she did not want to work for the FBI.  AF No. 60.

SA Ellingwood and EEO Investigator and Supervisory Special Agent Gary

Ludwick ("SSA Ludwick") have each submitted declarations concerning the allegations made against them in counts two through five of Ms. Wallace's amended complaint.  AF No. 62.  Concerning count two of Ms. Wallace's complaint, SA Ellingwood states that, although she does not recall advising Ms. Wallace that she might be labeled a troublemaker, she does recall informing Ms. Wallace that she might want to extend the counseling period before proceeding forward with her EEO complaint to see if FBI headquarters agreed to the relief Ms. Wallace had requested in her March 30, 2009, letter to FBI AD Raucci.  AF No. 63.1.  When Ms. Wallace advised SA Ellingwood that she wanted to proceed with the EEO complaint, SA Ellingwood immediately provided Ms. Wallace with all the necessary EEO forms. AF No. 63.2.

## III.   STANDARDS

### A.   Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R . Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

14

242, 248 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

**B.    Employment Discrimination Generally**

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases in which there is no direct evidence of discrimination. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[6]

---

[6] As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [sex or retaliation], . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though the defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

## IV.   ANALYSIS

### A.   Title VII Sex Discrimination

Ms. Wallace's sex discrimination claim centers upon SA Snider's administering of her PFT on March 16, 2009, in connection with her application to

---

578, 782 (11th Cir. 1989) (footnote omitted). Based upon this standard, Ms. Wallace's case is presented to the court as purely a circumstantial evidence one. (*See* Doc. 45 at 9 (citing to *McDonnell Douglas* as well as other circumstantial evidence employment decisions)).

become a SA with the FBI.  (Doc. 28 at 6 ¶ 45).  More specifically, Ms. Wallace alleges that the reason she failed the PFT is because SA Snider  was "unqualified" to perform the testing, "had a track record of not passing female applicants[,]" and "unfairly deducted six push-ups [in calculating the results of her] test" (*Id.* ¶¶ 46, 47).

In his Motion, the Attorney General contends that Ms. Wallace lacks evidence to establish a *prima facie* case of gender discrimination.  (Doc. 43 at 22-23).[7] Alternatively, the Attorney General maintains that Ms. Wallace cannot demonstrate pretext.  (*Id.* at 23-25).  The court addresses the merits of each ground below.

### 1.    *Prima Facie* **Case**

To establish a claim for gender discrimination under Title VII based on circumstantial evidence, Ms. Wallace must prima facially show that:

> (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) [s]he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside h[er] protected class.

*Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).  The Attorney General only challenges Ms. Wallace's ability to establish the last element.  As the Attorney General argues, Ms. Wallace's gender claim fails because "she cannot show

---

[7]   The page references for documents 43, 44-1, 44-2, 44-5, 44-6, 44-14, 44-15, 44-16, and 46 correspond with the court's CM/ECF numbering system.

that Snider treated male employees more favorably." (Doc. 42 at 22).

In the argument section of her opposition brief, Ms. Wallace does not dispute the Attorney General's *prima facie* position on count one in any appreciable manner and has essentially abandoned this issue. (*See generally* Doc. 45 at 11-22 (discussing only Ms. Wallace's ongoing protected Title VII activity relating to her retaliation claims and asserting violations of EEO confidentiality as an unlawful employment practice)); *see, e.g., Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned." (citing *Fehlhaber v. Fehlhaber*, 681 F.2d 1015, 1030 (5th Cir. 1982))); *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) ("[S]ince Wilkerson did not raise this issue until her supplemental reply brief, we deem it abandoned, and the district court's grant of summary judgment on this claim is consequently affirmed." (citing *McGinnis v. Ingram Equip. Co.*, 918 F.2d 1491, 1496 (11th Cir. 1990) (en banc))); *Bute v. Schuller International, Inc.,* 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) ("Because plaintiff[, in opposing summary judgment,] has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned.").

Pointing solely to SA Snider's lack of formal PFT credentialing and her

uncorroborated perception that SA Snider overlooked sloppiness on the part of the male applicant's efforts during the testing (Doc. 44-1 at 13 at 45 at line 21-25; Doc. 44-1 at 14 at 46-47 at lines 21-25, 1-3),[8] Ms. Wallace offers no appreciable proof that SA Snider's final scoring of her during the March 2009 PFT was less favorable than that for the male applicant, who SA Snider also examined on that same day.

In fact, Ms. Wallace admits that the male applicant also did not pass the PFT. (*See* Doc. 45 at 4 ¶ 22 (disputing only that Ms. Wallace "failed" her PFT and suggesting instead that what occurred was "improper[] scor[ing]" on the part of SA Snider)). Therefore, that particular male applicant is an unsuitable comparator witness. Additionally, Ms. Wallace does not rely upon any examples of other male prospective employees who purportedly received better treatment from SA Snider than she did on the PFT.

Furthermore, Ms. Wallace has not cited to any other circumstantial evidence that might satisfy this last element, such as a sexist comment made to Ms. Wallace by SA Snider during the course of her testing[9] or a statistically significant analysis of SA

---

[8] Ms. Wallace's breadth of experience with PFTs is limited to her role as a test taker.

[9] The court acknowledges that Ms. Wallace testified during her deposition that upon finishing the PFT:

Brad Snider then was pretty condescending talking to me about

Snider's overall scoring results for male versus female applicants, suggesting that SA Snider may hold a gender-related bias. *Cf. Burke-Fowler v. Orange County*, 447 F.3d 1319, 1325 (11th Cir. 2006) ("Because she failed to establish valid comparators and presented no other circumstantial evidence suggesting racial discrimination, Burke-Fowler did not establish a *prima facie* case of race discrimination." (citing *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000)).   Thus, the court agrees with the Attorney General that Ms. Wallace's *prima facie* case of sex discrimination is lacking.

### 2.   Pretext

Alternatively, her gender discrimination claim fails due to Ms. Wallace's inability to demonstrate pretext.   Regarding the results of Ms. Wallace's PFT, as articulated by SA Snider in his declaration:

> I do not recall the number of push-ups that Wallace complete on March 16, 2010.  I do not remember if I credited Wallace with every push-up she attempted during the test, or if I did not count some of the push-ups attempted by Wallace due to an inability to complete the push-

---

how some people just aren't made for the physical positions of the Bureau and how maybe I needed to look at an agency that wasn't as physical as the Bureau or maybe I could do an analyst position, but basically, he was just extremely condescending to me.

(Doc. 44-1 at 14 at 49 at lines 1-7).  However, SA Snider's general reference to "some people" lacks any indicia of a specific bias against women.

> up using proper protocol.  I know that it is common for applicants, both
> male and female to not be credited with all the sit-ups and/or push-ups
> they attempt, based on the sit-ups and/or push-ups not being completed
> using the proper protocol.

(Doc. 44-6 at 5).

As for advising Ms. Wallace about how she should alter her positioning when doing push-ups, SA Snider has stated that he gave her this information because he was aware of her previous difficulties with the push-ups component of the PFT and he was trying to assist her in having more of them counted as completed ones.

Finally, with respect to questioning Ms. Wallace about whether she was strong enough to hold the male applicant's legs during the testing period, SA Snider has explained that he routinely asks applicants if they are comfortable in maintaining such a holding position if there is a potential counterbalance issue stemming from significant weight differentials in the individuals being tested.

As the Eleventh Circuit has addressed the pretext prong in the context of an alleged discriminatory discharge:

> In any event, for purposes of the case before us, we need not
> resolve the apparent conflict within this circuit on whether a fact
> finder's possible disbelief of the employer's proffered reasons is
> sufficient to defeat judgment for the defendant or whether a plaintiff
> must show both that the employer's reason for the decision was false
> and that discrimination was the real reason, because Mayfield has failed
> to produce any evidence that Patterson's explanation is false or
> unworthy of credence.

In this case, Mayfield had to produce evidence that Patterson's reasons for his discharge were a pretext for discrimination. A plaintiff may prove pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095. "[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significant probative' evidence on the issue to avoid summary judgment." *See Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 443-44 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988)) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2510-11, 91 L. Ed. 2d 202 (1986)). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 443-44 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988)) (quoting *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir. 1987)).

*Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1375-76 (11th Cir. 1996) (emphasis added).

Ms. Wallace offers no significantly probative evidence to refute these explanations provided by SA Snider. Instead, Ms. Wallace spends a considerable amount of time disputing SA Snider's qualifications to administer PFTs. However, merely demonstrating improper or mistaken scoring by SA Snider due to a possible lack of training and/or understanding, without more, is not the equivalent of establishing gender-biased scoring. (*See* Doc. 46 at 2 ("Since Snider administered PFTs to both male and female applicants without being certified, the fact that he was

not certified has no bearing on Plaintiff's gender claim.")).

Also, while Ms. Wallace claims to have taken offense when SA Snider asked her if she was strong enough to handle holding the male applicant in position when he was doing the sit-up portion of the PFT, the purpose behind this question has been explained by SA Snider (*i.e.*, the counterbalancing and awkward positioning concerns) and, regardless, such an arguably gender-related inquiry, by itself, is insufficient to establish pretext. *Cf. Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002) ("Although a comment unrelated to a termination may *contribute* to a circumstantial case for pretext, it will usually not be sufficient absent some additional evidence supporting a finding of pretext.") (citation omitted) (emphasis in original).

At best, Ms. Wallace offers only her personal impressions and beliefs about SA Snider's unfavorable scoring of her during the PFT in an effort to substantiate pretext. Nevertheless, Ms. Wallace's own opinions are legally superfluous as "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (citing collection of appellate opinions from Third, Fourth, Seventh, and Eighth Circuits embracing this fundamental Title VII principle).

Regarding the triable nature of a discrimination claim, the Supreme Court has

clarified:

> Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves*, 530 U.S. at 148 (emphasis in original).

Because Ms. Wallace lacks any suitable comparator evidence and relies upon, at best, only weak issues of fact regarding pretext, the record, with respect to sex discrimination, lacks "'evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions.'" *MacPherson v. University of Montevallo*, 922 F.2d 766, 776 (11th Cir. 1991) (quoting *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1998)). Accordingly, the Motion is **GRANTED** on both *prima facie* and pretext grounds with respect to count one of Ms. Wallace's amended complaint.

### B.     Title VII Retaliation

The Attorney General's Motion primarily asserts that Ms. Wallace cannot establish a *prima facie* case of retaliation.   Secondarily, the Attorney General contends that Ms. Wallace cannot show pretext.

In *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), the Supreme Court held regarding retaliation under Title VII:

> We conclude that the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace.  We also conclude that the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant.   In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

*Burlington Northern*, 548 U.S. at 57, 126 S. Ct. at 2409.  Prior case law in the Eleventh Circuit limited the foundation of retaliation claims to treatment amounting to adverse employment actions.  Accordingly, the *prima facie* elements for retaliation under Title VII pre-*Burlington Northern* were proof of: "(1) statutorily protected expression; (2) . . . an adverse employment action; and (3) . . . a causal connection between the two events." *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).

The Eleventh Circuit has explained the impact of *Burlington Northern* on the

second *prima facie* element to a Title VII retaliation claim as:

> [T]he Supreme Court has defined an adverse employment action in the context of a retaliation claim as an action by an employer that is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination.

*Wallace v. Georgia Dept. of Transp.*, 212 Fed. App'x 799, 802 (11th Cir. 2006) (citation omitted).   Accordingly as reformulated post-*Burlington Northern*, "[t]o establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events."   *Butler v. Alabama Dept. of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008) (internal quotation marks omitted) (quoting *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008)).

As this court has previously explained in this very lawsuit:

> The court finds that the pressuring and repeated nature of these alleged acts, which all arose subsequent to and directly out of Ms. Wallace's filing of her EEO Title VII complaint at the administrative level and which were made by FBI personnel, falls squarely within the material adversity standard of retaliatory actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57, 126 S. Ct. at 2409.   Under *Burlington*'s enlarged definition of Title VII retaliation, Ms. Wallace no longer must identify an adverse employment-related action taken by the FBI to support her claim as Title VII's "antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace."

(Doc. 27 at 18-19); *see also Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) ("In other words, the proscription against retaliation sweeps more broadly than the proscription against gender discrimination.").

As the Eleventh Circuit described protected activity in *E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171 (11th Cir. 2000):

> Title VII's retaliation provisions do protect certain kinds of activity. Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3 (a). And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.* . . .
>
> The participation clause covers participation in "an investigation . . . under this subchapter," that is, an investigation under subchapter VI of Chapter 21 of Title 42 (42 U.S.C. §§ 2000e- 2000e-17). 42 U.S.C. § 2000e-3(a). This clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC. *See Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978) (stating that participation means "participation in the machinery set up by Title VII to enforce its provisions"). We conclude that, because no EEOC complaint had been filed before Warren's termination, her taking part in Defendant's internal investigation did not constitute protected expression under the participation clause of Title VII.

*Total System*, 221 F.3d at 1174 (footnotes omitted).

Here, while Attorney General has stipulated that Ms. Wallace engaged in protected EEO activity (*see* Doc. 46 at 8 ("Defendant admits this and has never

contended otherwise.")), neither side has expressly characterized what type of Title VII retaliation claims Ms. Wallace is pursuing. Two of Ms. Wallace's retaliation claims (counts two and three) allegedly arise prior to her filing of an EEO complaint and the remaining two (counts four and five) arise after that statutorily protected conduct.

### Count Two (Pre-EEO Complaint)

Count two is premised upon SA Ellingwood telling Ms. Wallace that if she formally filed an EEO complaint about her PFT, she might be labeled a "troublemaker" and to "wait and see" before taking such an action.

### Count Three (Pre-EEO Complaint)

Count three is premised upon SA Ellingwood's failure to respond to Ms. Wallace's email dated November 23, 2009, in which she indicated her desire to file a discrimination complaint against AS Coachman of the FBI and the Chief Division Counsel SA Zicarelli concerning her PFT.

### Count Four (Post-EEO Complaint)

Count four is premised upon SA Ellingwood's repeated efforts to persuade Ms. Wallace to drop her EEO complaint, including allegedly telling her that "[s]ometimes you have to look out after yourself and not be a martyr."

**Count Five (Post-EEO Complaint)**

Count five is premised upon FBI EEO Investigator SSA Ludwick's repeated efforts to persuade Ms. Wallace to drop her EEO complaint.

Based upon the definitions contained in *Total System*, this means that counts two and three of Ms. Wallace's amended complaint are most likely opposition-based retaliation claims, while counts four and five appear to be participation-based.

### 1. Retaliation Counts Two, Three, and Four Involving SA Ellingwood

#### a. *Prima Facie* Case

Against this backdrop, the court addresses the merits of the Attorney General's challenges of Ms. Wallace's collection of retaliation claims, which all are commonly connected to her decision to file an EEO complaint asserting gender discrimination in the administering of her PFT by SA Snider.  The Attorney General's *prima facie* position presents "the issue of whether any of the alleged acts of retaliation raised by [Ms. Wallace] rise to the level of a materially adverse action under the standard set forth in *Burlington* [*Northern*]."  (Doc. 46 at 8).

In moving for summary judgment, the Attorney General frankly acknowledges that he "has been unable to find any Eleventh Circuit case law with facts analogous to the retaliation claims made by [Ms.] Wallace . . . ."  (Doc. 43 at 28).  Instead, he relies upon *Gaujaco*, *supra*, a decision issued by the Court of Appeals for the District

of Columbia, for the proposition that Ms. Wallace is unable, as a matter of law, to establish the materially adverse element with respect to her retaliation claims.

In agreeing with the district court that granting summary judgment on the plaintiff's retaliation claim premised upon certain verbal statements was appropriate, the *Gaujaco* court reasoned:

> Appellant's third claim of retaliation-Creuzet's statement that "[y]our career is dead in EDF if you file the claim"-also fails. A threatening verbal statement, standing alone, might well constitute a materially adverse action. However, in assessing such a claim, *Burlington* emphasizes that "[c]ontext matters" and that "the significance of any given act of retaliation will often depend upon the particular circumstances." *Burlington*, 548 U.S. at 69, 126 S. Ct. 2405. Therefore, a statement that literally appears to be threatening is not necessarily a materially adverse action. An employer's words and other actions must be considered in context to determine whether they would "dissuade a reasonable worker" from filing a claim and thus result in actionable retaliation. *See id.* at 57.

> Gaujacq contends that Creuzet's statement was a materially adverse action sufficient to make out a *prima facie* case of retaliation. We disagree. In the context of this case, a reasonable worker in Gaujac's position would not have taken Creuzet's brief, fleeting, and <u>unadorned verbal statement</u> as an act or threat of retaliation. Both before and after Creuzet's statement, top EDF officials went out of their way to accommodate Gaujacq's desire to stay in the United States, despite her increasing insubordination and refusal to consider any future employment decision that did not meet her precise demands. Neither her contract nor company practice gave Gaujacq any right to remain in Washington, D.C. once she completed her term as General Delegate and EDFINA President. Yet, EDF officials indulged her at every turn-first by extending her contract by a year, then by negotiating with her to find a way to allow her stay in Washington, D.C., and finally by creating a Vice President's position for her. But nothing that the company did

30

satisfied Gaujacq and she persisted in disparaging Nadal's authority and refusing to cooperate with him.

Creuzet's disputed statement to Gaujacq came at a time in late July when Gaujacq was telephoning company officials to complain again about her situation with Nadal. Creuzet first told her that he did "not have time to discuss the differences of views between managers" and then stated, "[y]our career is dead in EDF if you file the claim." In this context-given all that the company had done for her-Creuzet's statement appears less a threat than an expression of exasperation over Gaujacq's ongoing antics. After all, it was Creuzet who spent so much time earlier in the year negotiating with Gaujacq in an effort to find a way for her to remain in Washington, D.C. <u>No reasonable employee who received as much accommodation as did Gaujacq could construe Creuzet's statement as an unlawful retaliatory threat</u>. Therefore, in the "particular circumstances" of this case, we hold that the verbal statement made by Creuzet did not constitute a materially adverse action. *Burlington*, 548 U.S. at 69, 126 S. Ct. 2405.

*Gaujacq*, 601 F.3d at 578 (emphasis added).

Of course, because the decision is non-binding precedent within the Eleventh Circuit, this court is not obligated to follow *Gaujacq*. Moreover, given the dearth of any on-point published or even unpublished opinions issued by the Eleventh Circuit in which the alleged materially adverse acts are tied directly to a plaintiff's pursuit of an EEO claim against the prospective employer, the court has no indication about whether the Eleventh Circuit would likely agree with *Gaujacq*'s reasoning.

However, even if it were binding precedent, *Gaujacq* is significantly distinguishable for at least two reasons. One, Ms. Wallace, if believed by a jury, endured a series of verbal statements and conduct by SA Ellingwood, her assigned

31

EEO counselor, with some of those predating the filing of her EEO complaint and others postdating it. Therefore, SA Ellingwood's disputed reactions to Ms. Wallace's decision to participate in the EEO process were neither "brief," "fleeting," nor "unadorned" in nature.

Two, Ms. Wallace disagrees with the Attorney General's facts surrounding her opportunity to take the makeup PFT, and testified that she encountered difficulties in trying to schedule a retaking of the PFT and only got AS Coachman's cooperation after threatening to file an EEO claim against her. (*See, e.g.*, Doc. 44-1 at 18 at 65 at lines 16-18 ("I tried to take the re-test later on. In 2009 I contacted Sherolynne Coachman several times to which she did not respond to me."); *id.* at 23 at 84 at lines 12-16 ("This is–this was the email that was sent [by AS Coachman] only after I contacted Ellingwood telling her that I wanted to file an EEO complaint against Sherolynne Coachman. This was the only contact I received, only after requesting an EEO.")). In contrast, *Gaujacq* indicates that many efforts were made by many managers to accommodate the plaintiff's request to remain employed in the Washington, D.C. area and this history of undisputed accommodations in favor of the plaintiff militated against any reasonable finding of material adversity.

Therefore, because "[c]ontext matters" under *Burlington Northern*, the court is not persuaded to apply *Gaujacq* to the "particular circumstances" of this lawsuit

that relate to SA Ellingwood's contested comments and conduct.  Instead, because reasonable minds can differ as to whether Ms. Wallace has satisfied *Burlington Northern*'s material adversity standard, she has established a *prima facie* case of retaliation that survives summary judgment under counts two, three, and four. Therefore the material adversity portion of the Attorney General's Motion is **DENIED** as to those particular counts.

### b.    Pretext

Alternatively, the Attorney General maintains that SA Ellingwood, through her declaration, reasonably explained her interactions with Ms. Wallace and that Ms. Wallace's retaliation claims involving her fail because of the absence of any pretext with respect to those explanations.  In making this argument, the Attorney General presumes that the only manner by which Ms. Wallace can survive summary judgment is by meeting the *McDonnell Douglas* model.

However, as the Eleventh Circuit has articulated in its reversal of a summary judgment dismissal of a race discrimination claim:

> The district court, in dismissing Mitten's claim of race discrimination, did as federal courts routinely do in disposing of cases, like this, in which the plaintiff claims that his employer applied a workplace-conduct rule in violation of Title VII: the court used *McDonnell Douglas*'s burden-shifting framework. In so doing, the district court focused on whether Mitten's termination for his violation of the zero tolerance policy was more severe than the discipline Lockheed imposed on similarly situated black comparators. Mitten's

33

comparators were deemed not "similarly situated," so the court found no tenable claims of race discrimination.   If the record contained no circumstantial evidence from which a jury could otherwise infer that Mitten was fired because of his race, our discussion would end here, and we would affirm the district court's judgment.

However, establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.   Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case.

Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.   *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (declaring that, in cases where a plaintiff cannot establish a *prima facie* case, summary judgment only will be "appropriate where no other evidence of discrimination is present." (citations omitted)); *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011) ("To avoid summary judgment . . . the plaintiff must produce sufficient evidence, either direct or circumstantial, to create a triable question of intentional discrimination in the employer's decision."). A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."   *Silverman*, 637 F.3d at 734 (citations and internal quotation marks omitted); *see also James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000) ("[T]he way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination.").

A plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence.   *Rioux v. City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008) (holding that the plaintiff established a *prima facie* case of racial discrimination when he did not present evidence of a comparator but presented other circumstantial evidence that was sufficient); *see also Alvarez v. Royal*

*Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (stating that the circumstantial evidence necessary to present a Title VII case of discrimination under *McDonnell Douglas* is "flexible and depend[s] on the particular situation" (citations omitted)); *cf. Burke–Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1325 (11th Cir. 2006) (affirming the district court's grant of summary judgment because plaintiff "failed to establish valid comparators and presented *no other circumstantial evidence suggesting racial discrimination*" (emphasis added)). <u>Yet, no matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.</u>

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1327-28 (11th Cir. 2011) (footnotes omitted) (emphasis added).

Even though *Lockheed* involved a Title VII race discrimination claim, the court cannot think of any compelling reason why its reasoning should not apply equally to a Title VII retaliation claim.  Moreover, the conventional articulation of a legitimate explanation/pretext model[10] does not neatly operate under the disputed factual circumstances of SA Ellingwood's counseling of Ms. Wallace. For example, SA Ellingwood's statements in her declaration indicate the existence of a material factual dispute over whose idea it was to withdraw Ms. Wallace's EEO complaint–hers or Ms. Wallace's.  (Doc. 44-16 at 4 ¶ 11).

---

[10]   In more routine retaliation actions, the parties are agreement over the allegedly materially adverse action that occurred (*e.g.*, a decrease in pay, a discharge, a non-promotion, etc.), and only disagree about what motivated the decisionmaker to engage in that specific conduct. In this situation, however, the parties' factual accounts of SA Ellingwood's dealings with Ms. Wallace materially diverge.

Also, SA Ellingwood states that:  (i) she does not "recall ever advising Ms. Wallace that she would be labeled a 'troublemaker'" (Doc. 44-16 at 4-5 ¶ 15); (ii) she does not "recall" receiving an email from Ms. Wallace on November 23, 2009, indicating "that she wanted to file a discrimination complaint against Administrative Specialist Sherolynne Coachman and Chief Division Counsel Ray Zicarelli" (Doc. 44-16 at 5 ¶ 17); and (iii) she does not "recall ever advising Ms. Wallace that she should 'look out after' herself or that she should not be a 'martyr'" (Doc. 44-16 at 6 ¶ 20).

Setting aside the issue of whether vaguely "not recalling" doing something is the evidentiary equivalent of affirmatively remembering "not doing" something, these declarative statements by SA Ellingwood, if believed, are in conflict with Ms. Wallace's version of the facts.  Therefore, they cannot and do not explain the legitimacy of SA Ellingwood's treatment of Ms. Wallace <u>if Ms. Wallace's factual account of their interaction is found to be credible</u>.  Put differently, because this court is obligated on summary judgment to view the record in a light most favorable to Ms. Wallace, the Attorney General's advancement of a legitimate explanation which requires this court's acceptance of disputed testimony about what occurred between SA Ellingwood and Ms. Wallace leading up to and during the course of the FBI

internal EEO process is simply underdeveloped and unworkable.[11]

In sum, the record regarding SA Ellingwood's retaliatory acts as presented by Ms. Wallace contains "evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions." *Verbraeken*, 881 F.2d at 1045. Accordingly, the Motion is **DENIED** regarding counts two, three, and four of Ms. Wallace's amended complaint.

## 2.    Retaliation Count Five Involving SSA Ludwick

The court reaches a different conclusion concerning Ms. Wallace's retaliation count involving SSA Ludwick. SSA Ludwick's declaration provides that while he does "generally recall conversations with Ms. Wallace regarding preparation of her signed, sworn statement[,] [a]t no point did I ever threaten, coerce, or otherwise pressure Ms. Wallace to drop her EEO complaint, nor did I otherwise retaliate against her in any way for participating in protected EEO activity." (Doc. 44-14 at 3-4 ¶ 4).

In effort to dispute this evidence, Ms. Wallace states that SSA Ludwick did tell

---

[11] The bulk of the Attorney General's briefing on retaliation focuses upon his material adversity arguments. (*Compare* Doc. 43 at 25-30, *with id.* at 30-31). Further, the only case cited by the Attorney General in his pretext section, *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261 (11th Cir. 2008) (Doc. 43 at 31), is unhelpful as it involves a retaliatory discharge claim asserted against a private sector employer as opposed to retaliation arising out of a public sector applicant's decision to engage in Title VII protected activities and that respective federal agency's internal handling of the EEO process.

her to drop her complaint and cites to certain testimony from her deposition transcript as underlying support.  (*See* Doc. 45 at 7 ¶ 66 ("The Plaintiff was threatened, coerced, or otherwise pressured, to drop her complaint because SSA Ludwick improperly advised her to do so.")).

While Ms. Wallace suggests that her deposition testimony establishes that SSA Ludwick advised her to drop her EEO complaint (*See* Doc. 45 at 7 ¶ 66 (citing Doc. 44-1 at 28 at 104 at line 2)), a reading of an excerpt from a portion of the transcript to which she has cited complains only about SSA Ludwick's "shoddy" EEO investigation[12] and does not otherwise substantiate her position that he urged her to drop her complaint:

> Q.     And, so, while you said you believe you wouldn't have been given a fair test, do you have any facts to support your belief in that regard?
>
> A.     I do.  The fact that I had with the situation with Ludwick doing the shoddy – the shoddy investigation.
>
>       Also the numerous people that requested I drop my complaint, which was – just really didn't . . . it looked to me that – that evidence supports that fact that the Bureau was talking at multiple levels, multiple

---

[12]  The court has previously dismissed, on sovereign immunity grounds, all of Ms. Wallace's claims premised exclusively upon an allegedly deficient EEO process. (*See* Doc. 27 at 12-13 ("Accordingly, the court agrees with the Attorney General that counts two and three of Ms. Wallace's complaint are due to be dismissed on sovereign immunity grounds "'except to the extent that they allege a claim of retaliation for prior protected EEO activity.'" )).

cities.

And so, I feel like even in Mobile, at that point, I don't believe I would have gotten a fair test.

(Doc. 44-1 at 28 at 103-04 at lines 21-25, 1-9); (*see also* Doc. 46 at 9 ("Regarding Ludwick, Plaintiff has not even identified any statements that she claims Ludwick made to her, much less that she suffered any harm because of Ludwick.")).

Therefore, in the absence of any proof adduced by Ms. Wallace which contradicts the concretely-expressed contents of SSA Ludwick's declaration, Ms. Wallace is unable to satisfy *Burlington Northern*'s material adversity standard in connection with the retaliation claim involving him.  Accordingly, the Motion is **GRANTED** on *prima facie* grounds with respect to count five, and the court does not address the issue of pretext.

## V.     CONCLUSION

In sum and as reasoned above, the Attorney General's  Motion is **GRANTED IN PART** with respect to counts one and five of Ms. Wallace's amended complaint and otherwise is **DENIED**.  By separate order, the court will set this case for a final pretrial conference.

**DONE** and **ORDERED** this the 10th day of May, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge